807 A.2d 179

## BLAKEHURST LIFE CARE COMMUNITY/THE CHESTNUT REAL ESTATE PARTNERSHIP,

v.

## BALTIMORE COUNTY, Maryland, et al.

### No. 1591, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Sept. 10, 2002.

Benjamin Rosenberg (Rosenberg, Proutt, Funk & Green-
berg, LLP, Baltimore, John H. Zink, III, Patricia A. Malone

and Venable, Baetjer and Howard, LLP, Towson, on brief) for appellant.

J. Carroll Holzer (Holzer & Lee, on the brief) Towson, for appellee.

Argued before SALMON, SHARER, CHARLES E., MOYLAN JR., (Retired, Specially Assigned), JJ.

SHARER, Judge.

Blakehurst Life Care Community/The Chestnut Real Estate Partnership ("Chestnut/Blakehurst"), appeals from a decision of the Circuit Court for Baltimore County, affirming a decision of the County Board of Appeals (the Board),[1] denying Chestnut/Blakehurst's request for approval of the addition of 63 parking spaces to the Blakehurst premises. Appellants raise the following questions for our review:

I. Did the Board of Appeals exceed its jurisdiction when it denied approval of a refinement to a development plan based on its interpretation of a restrictive covenant agreement?

II. If not, was the Board of Appeals interpretation of the agreement legally correct?

Because we find that the Board did not exceed its jurisdiction in interpreting the agreement, and because we do not find error in the Board's decision, we shall affirm.

### The History of Blakehurst

Blakehurst Life Care Community is a 278 unit continuing care/assisted living community located on Joppa Road in Towson, Baltimore County. It was developed by the Chestnut Partnership in 1988.

Because there was, at that time, opposition from the neighboring community (represented primarily by the Ruxton–

---

1. For the benefit of the reader, we append hereto a glossary of acronyms and abbreviations identifying the various agencies involved in the zoning, planning, and permit process in Baltimore County. See Appendix I.

Riderwood–Lake Roland Area Improvement Association) (the Association) in which the development was planned, there evolved a restrictive covenant agreement (the Agreement) which allowed the initial development to go forward. The Agreement was adopted by the appropriate Baltimore County agencies as the operative controlling document for the development of Blakehurst, and for future expansions and improvements.

## FACTUAL AND PROCEDURAL BACKGROUND

### *The 1988 Restrictive Covenant Agreement*

In 1988, the Chestnut Partnership submitted to the Baltimore County Review Group (CRG) a plan to build a continuing care facility on a 40.92 acre tract at 1055 Joppa Road in Towson. On September 8, 1988, following a public meeting, the CRG approved the plan. Adjacent property owners and the Association filed an appeal of the CRG approval to the Baltimore County Board of Appeals.

The Chestnut Partnership then filed petitions for a special exception and variance with the Baltimore County Zoning Commissioner. Following a hearing on September 25, 1988, the Zoning Commissioner denied the requests ruling that "... the size and scope of the project is inconsistent with the peaceful use and enjoyment of the surrounding neighborhood." The Chestnut Partnership filed a timely appeal of that decision to the Board.

To avoid further administrative litigation, and probable appeals, relating to the proposed development, the Chestnut Partnership, the Association, and several individual adjacent property owners entered into the Restrictive Covenant Agreement. The Agreement, executed on October 13, 1988, stipulated that specifically identified maps, plans, plats, and other pertinent documents, would define the size and scope of the Blakehurst development (1) for 25 years on the portion of the land containing the residential buildings and (2) for 50 years on the remaining portion of the land.

The Chestnut Partnership, the Association and the individual parties to the Agreement then requested that the Board consolidate the pending appeals (the CRG approval appeal and the special exception denial appeal) and to approve the development in the terms defined by the Agreement. The Board acquiesced and, on October 25, 1988, entered a consent order adopting and incorporating the Agreement. The consent order provided, in relevant part, that

The Continuing Care Facility hereby approved shall conform in all respects to the terms and conditions of the October 13, 1988 Restrictive Covenant Agreement and Exhibits between the parties, which is hereby incorporated as a part of this Order as if it were fully set forth herein.

Blakehurst was then developed and constructed by the Chestnut Partnership.

Pertinent to our discussion throughout are Paragraphs 1(f) and 12 of the Agreement. Paragraph 1(f) provides that

[r]easonable adjustments in the location of buildings, parking and other features of the Community shall be permitted upon the direction and approval of the Director of Planning for Baltimore County, it being the intention of all parties to maximize the retention of existing trees and vegetation on the Land and to permit a degree of flexibility in addressing the nature and constraints of the site, appropriate governmental building standards and requirements and the needs of the elderly residents.

Paragraph 12 sets forth that "[t]his Agreement may be amended by a written instrument in recordable form, executed by Chestnut, and by the Advisory Board [of the Association] after a favorable vote of 3/4 of the Board or their successors."

### *1989 through 1998*

Between 1989 and 1998, the Chestnut Partnership proposed five changes in the Blakehurst development, including two proposals to create additional parking spaces under and around the buildings. Each time, Blakehurst negotiated with

appellees, and agreement was reached, resulting in five addenda to the Agreement as contemplated by Paragraph 12.

## The Addenda

The first addendum to the Agreement, dated December 28, 1989, permitted Chestnut to increase the number of residential units beyond that called for in the original approval.

The second addendum, (inexplicably dated November 9, 1989), allowed the re-positioning of security gates.

The third addendum, and the most complex, was approved on September 7, 1990. It dealt with modifications of the original plan relating to the size and location of buildings and the location of surface parking, as well as with several procedural subjects.

The fourth addendum, dated November 5, 1996, permitted the development of a number of underground parking spaces.

The fifth, and last, addendum, dated June 29, 1998, allowed for the creation of additional surface parking, for the enlargement of an existing building, and for the construction of additional buildings.

### *1999 Request for Additional Parking Spaces*

In the fall of 1999, Chestnut/Blakehurst developed a proposal to add 30 surface parking spaces in the vicinity of the Health Care Building and 33 surface parking spaces in the vicinity of a residential structure, identified as Building F. As in the past, Chestnut/Blakehurst approached appellees in the hope of formulating the sixth addendum to the Agreement. Appellees, however, objected and vigorously opposed the proposal.

Chestnut/Blakehurst then applied for the "direction and approval" of the Director of the Office of Planning (OPZ) pursuant to Paragraph 1(f) of the Agreement. After discussions with Chestnut/Blakehurst and appellees, the Director approved the proposal on October 29, 1999. With the Director's "direction and approval" in hand, Chestnut/Blakehurst filed a request with the DRC for permission to develop the 63

additional parking spaces as a "refinement" to the last approved CRG plan.

On November 1, 1999, the DRC met to review the Chestnut/Blakehurst request and, thereafter, recommended approval of the additional parking spaces as a "refinement" to the CRG plan. On November 8, 1999, Arnold Jablon, Director of the Department of Permits and Development Management (DPDM), accepted the DRC's recommendation and approved the request as such a "refinement." Chestnut/Blakehurst subsequently submitted a 4th Amended CRG Plan for approval, which the CRG granted on November 19, 1999.

Appellees filed two timely appeals with the Board. In the first, they took exception to the DPDM's determination that the proposal was a "refinement"; in the other they challenged the CRG's approval of the additional parking. The Board consolidated the appeals and considered both issues at a hearing on May 30, 2000.

Chestnut/Blakehurst contends that the only issue before the Board was whether the proposed additional parking fell within the definition of a "refinement," thus obviating the need for an agreed addendum to the Agreement. Appellees posit that the only issue before the Board was whether the Director and the DRC had the authority or jurisdiction to permit any amendment, whether "material" or simply a "refinement," to the approved CRG plan without an addendum to the Agreement or, in the alternative, without approval of the Board to amend the Board's previous consent order.

Following the consolidated hearing, the Board issued an opinion sustaining the DRC's determination that the proposed additional parking was, in fact, a "refinement" to the CRG plan. The Board, however, reversed the decisions of the DRC and CRG, concluding that, although the additional parking was a "refinement," the Agreement required Chestnut/Blakehurst to obtain appellees' consent to the proposal in order to amend the CRG plan.[2]

---

**2.** One member of the Board filed a minority opinion agreeing with the majority that the proposal was merely a refinement, but opined that the

Chestnut/Blakehurst appealed the Board's decision to the Circuit Court for Baltimore County. After hearing, the circuit court affirmed the decision of the Board. Chestnut/Blakehurst has filed a timely appeal to this Court.[3]

## STANDARD OF REVIEW

We review the issues in this appeal as did the circuit court, that is, on the record before it, was the Board clearly erroneous in its findings of fact, or did it commit an error of law? In doing so, we give deference to the expertise of the agency whose ruling is being reviewed. As in *Angelini v. Harford County,* 144 Md.App. 369, 798 A.2d 26 (2002), we are presented primarily with the agency's interpretation of the zoning code and an operative order earlier passed by the agency. Judge Moylan wrote for this Court in *Angelini* that

[w]hen the caselaw discusses the standard of review to be applied to a decision of an administrative agency, it generally distinguishes between 1) the agency's findings of fact, to which great deference is due under the "clearly erroneous" standard; and 2) the agency's rulings of law, as to which the courts do not hesitate to substitute their judgment for that of the agency.

The critical agency determination in this case was not a finding of fact. Neither was it a ruling of law in the more common sense, although it was more like the latter than like

Board did not have jurisdiction to require an addendum to the Agreement and the consent order.

3. In December 2000, in a separate action filed by appellees against Blakehurst in the Circuit Court for Baltimore County, they requested injunctive relief prohibiting construction of the proposed parking spaces, contending it would be a violation of the Agreement. *Erwin H. Huber, et al. v. Chestnut Real Estate Partnership, et al.,* Circuit Court for Baltimore County, Case No. 03–C–00–005576. On November 29, 2001, Hon. Robert E. Cahill, relying on Judge Wright's decision to affirm the CBA in this administrative appeal, issued an order in *Huber* enjoining the construction of the sixty-three parking spaces. Blakehurst has appealed Judge Cahill's decision to this Court in a separate appeal entitled *Chestnut Real Estate Partnership, et al. v. Erwin W. Huber, et al.,* Case No. 01592, September Term, 2001.

the former. It was, rather, the agency's interpretation of a law or regulation with respect to which the agency has a special expertise. When such an interpretation is under review, judicial deference is called for.

*Angelini, supra,* 144 Md.App. at 373, 798 A.2d 26.

In *Board of Physician Quality Assurance v. Banks,* 354 Md. 59, 729 A.2d 376 (1999), the Court of Appeals set forth an appellate court's role in reviewing administrative agency decisions:

A court's role in reviewing an administrative agency adjudicatory decision is narrow, *United Parcel v. People's Counsel,* 336 Md. 569, 576, 650 A.2d 226, 230 (1994); it "is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law." *United Parcel,* 336 Md. at 577, 650 A.2d at 230. *See also* Code (1984, 1995 Repl.Vol.), § 10–222(h) of the State Government Article; *District Council v. Brandywine,* 350 Md. 339, 349, 711 A.2d 1346, 1350–1351 (1998); *Catonsville Nursing v. Loveman,* 349 Md. 560, 568–569, 709 A.2d 749, 753 (1998).

In applying the substantial evidence test, a reviewing court decides " ' "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." ' " *Bulluck v. Pelham Wood Apts.,* 283 Md. 505, 512, 390 A.2d 1119, 1123 (1978). See *Anderson v. Dep't of Public Safety,* 330 Md. 187, 213, 623 A.2d 198, 210 (1993). A reviewing court should defer to the agency's fact-finding and drawing of inferences if they are supported by the record. *CBS v. Comptroller,* 319 Md. 687, 698, 575 A.2d 324, 329 (1990). A reviewing court " 'must review the agency's decision in the light most favorable to it; ... the agency's decision is prima facie correct and presumed valid, and ... it is the agency's province to resolve conflicting evidence' and to draw inferences from that evidence." *CBS v. Comptroller, supra,* 319 Md. at 698, 575 A.2d at 329, quoting *Ramsay, Scarlett Co. v. Comptroller,* 302 Md. 825, 834–835, 490 A.2d 1296, 1301 (1985) *See Catonsville Nursing v.*

*Loveman, supra,* 349 Md. at 569, 709 A.2d at 753 (final agency decisions "are *prima facie* correct and carry with them the presumption of validity").

Despite some unfortunate language that has crept into a few of our opinions, a "court's task on review is *not* to ' " 'substitute its judgment for the expertise of those persons who constitute the administrative agency,' " ' " *United Parcel v. People's Counsel, supra,* 336 Md. at 576–577, 650 A.2d at 230, quoting *Bulluck v. Pelham Wood Apts., supra,* 283 Md. at 513, 390 A.2d at 1124. Even with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency. Thus, an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts. *Lussier v. Md. Racing Commission,* 343 Md. 681, 696–697, 684 A.2d 804, 811–812 (1996), and cases there cited; *McCullough v. Wittner,* 314 Md. 602, 612, 552 A.2d 881, 886 (1989) ("The interpretation of a statute by those officials charged with administering the statute is ... entitled to weight"). Furthermore, the expertise of the agency in its own field should be respected. *Fogle v. H & G Restaurant,* 337 Md. 441, 455, 654 A.2d 449, 456 (1995); *Christ [ex rel. Christ] v. Department of Natural Resources,* 335 Md. 427, 445, 644 A.2d 34, 42 (1994) (legislative delegations of authority to administrative agencies will often include the authority to make "significant discretionary policy determinations"); *Bd. of Ed. For Dorchester Co. v. Hubbard,* 305 Md. 774, 792, 506 A.2d 625, 634 (1986) ("application of the State Board of Education's expertise would clearly be desirable before a court attempts to resolve the" legal issues).

*Board of Physician Quality Assurance, supra,* 354 Md. at 67–69, 729 A.2d 376 (footnotes omitted).

In *Marzullo v. Kahl,* 366 Md. 158, 783 A.2d 169 (2001), in which the issues to be reviewed were not dissimilar to those presented here, Judge Cathell wrote that

In [this case], the facts of the case are not in dispute; however, the Board of Appeals' interpretation and applica-

tion of the [zoning regulations] is in dispute. As stated in *Banks,* even though the decision of the Board of Appeals was based on the law, its expertise should be taken into consideration and its decision should be afforded the appropriate deference in [an] analysis of whether it was "premised upon an erroneous conclusion of law." *Banks,* 354 Md. at 68, 729 A.2d at 380, quoting from *United Parcel Service, Inc. v. People's Counsel for Baltimore County,* 336 Md. 569, 577, 650 A.2d 226, 230 (1994).

366 Md. at 173, 783 A.2d 169.

Here, the Board did not merely interpret and apply its own regulation, it interpreted and enforced its own previous order. We see no distinction between the interpretation by an administrative agency of a statute or regulation that the agency is charged to administer, and the interpretation by the agency of its own orders, as we will discuss below.

## DISCUSSION

### I. Did the County Board of Appeals exceed its authority by interpreting the Restrictive Covenant Agreement?

Blakehurst first argues that the Board exceeded its authority by reviewing the restrictive covenant agreement between the parties and enforcing its terms.

An administrative agency, such as the Board, is a " 'creature of statute, [which] has no inherent powers and its authority thus does not reach beyond the warrant provided it by statute.' " *Adamson v. Correctional Med.,* 359 Md. 238, 250, 753 A.2d 501 (2000) (quoting *Holy Cross Hosp. of Silver Spring, Inc. v. Health Servs. Cost Review Comm'n,* 283 Md. 677, 683, 393 A.2d 181 (1978)). Md. Ann.Code art. 25A, § 5(U) authorizes a charter county, such as Baltimore County, to enact local laws providing for the establishment of a board of appeals and, once established, to empower such board to decide "matters arising (either originally or on review of the action of an administrative officer or agency) under any law,

ordinance, or regulation of ... the county council." Md. Ann.Code art. 25A, § 5(U).

Baltimore County established the Board. Baltimore County Charter (B.C.C.) § 601; see *United Parcel v. People's Counsel,* 336 Md. 569, 588–89, 650 A.2d 226 (1994) (discussing the authority granted by § 5(U), particularly as it relates to the Baltimore County Board of Appeals). Baltimore County vested the Board with original jurisdiction as to petitions for zoning reclassification and with appellate jurisdiction for other matters, including orders related to zoning, licenses, building, and all executive, administrative, and adjudicatory orders. B.C.C., Charter § 602.

Chestnut/Blakehurst, when seeking regulatory approval for the commencement of the Blakehurst project, negotiated with appellees and their predecessors, the result of which was that appellees bargained away their objection to the project in return for certain restrictions and limitations on the scope of the development. That agreement, as we have seen, was incorporated into the Board's order. We agree with Chestnut/Blakehurst that, under its enabling statute, the Board does not have authority to interpret and enforce a private contract, such as restrictive covenant agreement, absent more. But Chestnut/Blakehurst, in order to remove the impediment of neighborhood protest to the initial project, acquiesced in the incorporation of the Agreement into the Board's formal opinion and order in 1988 by the language that we have earlier quoted.

The Agreement, by incorporation into the consent order, thus became a public document as contrasted with a private agreement. Having attained the status of an order of the Board, it became enforceable by the Board. Chestnut/Blakehurst, having utilized the Agreement and consent order to attain the goal of development, now, for the first time, seeks to disavow the process, relying upon the language in Sec. 1(f) of the Agreement, which we will discuss, *infra.*

The use of restrictive covenants or conditions to obtain regulatory approval of land and property use is not novel. In

*Montgomery County v. Mossburg,* 228 Md. 555, 180 A.2d 851 (1962), where the property owner acquiesced in the imposition of certain conditions on the operation of his business, the Court of Appeals noted that "[w]e have heretofore, at least by necessary implication, recognized that a condition to a special exception, the effect of which was to limit the privilege granted by a liquor license, could validly be ordered by a zoning board." 228 Md. at 560–61, 180 A.2d 851. See also *Oursler v. Board of Zoning Appeals,* 204 Md. 397, 104 A.2d 568 (1954).

Appellants assert that ". . . the Board of Appeals does not have jurisdiction to interpret and enforce restrictive covenant agreements." As an abstract statement of zoning law that position is sound. "The ordinance does not override or defeat whatever private rights exist and are legally enforceable, but neither is it controlled in its workings or effects by such rights." *Perry v. Board of Appeals,* 211 Md. 294, 299, 127 A.2d 507 (1956). However, *Perry* and other cases cited for the proposition are distinguishable, in that none of them have, as a factual component, a covenant or condition negotiated into a consent order. Those cases all deal with the effect of subsequently enacted zoning regulations on earlier privately established covenants or restrictions.

 Ought judicial deference be given to an administrative agency's interpretation of its own order? There are several aspects to the deference question in this context. First, the agency's interpretation of its organic statute is entitled to deference. *Board of Physician Quality Assurance v. Banks,* 354 Md. 59, 729 A.2d 376 (1999). Second, ". . . a great deal of deference is owed to an administrative agency's interpretation of its own regulation." *Maryland Transp. Auth. v. King,* 369 Md. 274, 799 A.2d 1246 (2002). See also *Jordan Towing, Inc. v. Hebbville Auto Repair, Inc.,* 369 Md. 439, 800 A.2d 768 (2002).

 The third aspect presents the question of deference to be afforded an agency's interpretation of its own prior orders. We have found no Maryland case that specifically answers the question, so we have looked to the jurisprudence of other

jurisdictions for guidance. In so doing, we have found, for example, *Commonwealth of Pennsylvania v. Surface Transp. Bd.*, 290 F.3d 522 (3d Cir.2002) wherein the court noted that " '[w]e accord particular deference when, as here, the subject of review is the agency's interpretation . . . of its own order.' " 290 F.3d at 530 (quoting *National Motor Freight Traffic Ass'n v. ICC*, 590 F.2d 1180, 1184 (D.C.Cir.1978)). In a more recent decision, the D.C. Court of Appeals referred to the "presumption" of validity and "high level of deference" accorded an agency in interpreting its own orders, as well as its own regulations. *MCI Worldcom Network Servs., Inc. v. FCC*, 274 F.3d 542, 548 (2001). We find the logic of those authorities to be persuasive. Because in Maryland we accord judicial deference to an administrative agency's interpretation of the statute that gave it creation, and to an agency's interpretation of regulations enacted by it, we hold that deference should be accorded to an administrative agency in the interpretation of its own previously adopted orders.

It follows, therefore, from *Mossburg, supra,* that, if a condition or covenant, with the consent of the parties, can be validly ordered by a zoning board, such a condition can likewise be interpreted and enforced by the zoning authority. See *Board of Liquor License Comm'rs v. Fells Point Café*, 344 Md. 120, 685 A.2d 772 (1996) (holding that the zoning board could place restrictions on the issuance of a license with the consent of the licensees, and that enforcement of the consensual restrictions were within the jurisdiction of the board).

Therefore, under these circumstances, we conclude that the Board did not exceed its authority in its review and interpretation of relevant terms and provisions of the Agreement and Consent Order.

## II. Did the County Board of Appeals err in its interpretation of the Agreement?

Having determined that the Board was vested with the authority to interpret the Agreement and the Consent Order, we turn to the question of whether its interpretation was correct as a matter of law.

Appellants further argue that, even if the provisions of the Agreement in Section 1(a) through 1(e) are enforceable by the Board as consensual restrictive covenants, Section 1(f) is not because that provision refers, not to restrictions, but to the amendment process to be followed by the parties. We note, however, that Section 12 of the Agreement is entitled "Amendment" and suggest that, if Section 1(f) is to be interpreted as a guide for the amendment process, it is misplaced under Section 1, which is entitled "Community Scope." We do not read Section 1(f) as controlling the amendment process.

▮▮ Maryland has long adhered to the law of objective interpretation of contracts. *Auction & Estate Representatives v. Ashton,* 354 Md. 333, 731 A.2d 441 (1999); *Calomiris v. Woods,* 353 Md. 425, 727 A.2d 358 (1999); *Adloo v. H.T. Brown Real Estate, Inc.,* 344 Md. 254, 686 A.2d 298 (1996); *State v. Attman/Glazer P.B. Co.,* 323 Md. 592, 594 A.2d 138 (1991). The clear and unambiguous language of an agreement will not give way to what the parties thought the agreement meant or was intended to mean. *Auction Estate Representatives, supra; Adloo, supra; GMAC v. Daniels,* 303 Md. 254, 492 A.2d 1306 (1985).

The specific wording of Section 1(f) provides, in pertinent part, that "[r]easonable adjustments in the location of ... parking ... shall be permitted upon the direction and approval of the Director of Planning...." We first note that the section speaks to the "adjustments in the location" of parking, not the creation of additional parking. "Adjust" is defined as to "alter or move slightly in order to achieve the desired fit, appearance, or result; to permit small alterations so as to allow a desired fit or result." THE NEW OXFORD AMERICAN DICTIONARY 20 (2001). Our objective interpretation of Section 1(f), taken in context with the entire agreement, leads us to conclude that the section is not severable from Sections 1(a) through 1(e). As we see it, Section 1(f) is designed to avoid the need for negotiation on minor questions of parking or other features. Our conclusion, we hasten to add, is bolstered by the past practice of the parties' in dealing

with parking facilities; in each case an addendum was proposed, negotiated and incorporated into the 1988 consent order. In fact, two of the five previous addenda related, at least in part, to parking-related modifications.

■ Appellants take a fallback position, to wit: even if the Board was within its jurisdiction to review and interpret the Agreement under the terms of its consent order, it erred by finding that the Agreement, even in the case of a "refinement," required consent by appellees. The Board ruled that the DRC did not have the authority to amend the CRG plan without reference to the Agreement and the consent order. We agree.

■ "Where the language of the consent decree is clear and unambiguous, all terms in the decree 'are to be given their plain meaning in construing the order.'" *Kirby v. Kirby,* 129 Md.App. 212, 216, 741 A.2d 528 (1999) (quoting *Shanty Town Assocs. Ltd. P'ship v. Department of Env't.,* 92 Md.App. 103, 112, 607 A.2d 66 (1992), *cert. denied,* 328 Md. 94, 612 A.2d 1316 (1992)).

The Director of Planning under the terms of the Board's 1988 consent order and incorporated Agreement, lacked the authority to approve expansion of the facilities.

The Board was correct that no other agency or official could amend the terms and conditions of its 1988 consent order, and the incorporated Agreement, without the appellees written approval by way of addendum, or by a petition for special hearing to request that the Board modify the conditions and terms of the consent order and the Agreement.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**

### Appendix I

BCA Baltimore County Board of Appeals

CRG County Review Group

OPZ Office of Planning and Zoning

**Appendix I—Continued**

DOPZ Director, Office of Planning and Zoning

DPDM Department of Permits and Development Management

DRC Development Review Committee

BCC Baltimore County Charter